UNITED STATES DISTRICT COURT
FOR THE
WESTERN DISTRICT OF NEW YORK

PRINCESS M. HARPER,                       )
                                          )
      Plaintiff,                          )
                                          )
    v.                                    )      Case No. 1:21-cv-760
                                          )
CHARTER COMMUNICATIONS,                   )
                                          )
      Defendant.                          )

**ORDER AND OPINION DENYING MOTION FOR SUMMARY JUDGMENT**
**(Doc. 32)**

Plaintiff Princess Harper ("Ms. Harper") sues her current employer, Charter Communications ("Charter") for failing to provide her with a reasonable accommodation in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12112. (*See* Doc. 1.) Ms. Harper alleges that she requested that Charter allow her to work from home, a request which Charter denied from spring 2017 until spring 2020, when the State of New York mandated that most employees work from home due to the COVID-19 pandemic. (*Id.*) For relief, she seeks "injunctive orders, damages, costs and attorney's fees." (*Id.* at 6.)

Charter maintains that, although it refused Ms. Harper's requested accommodation, it satisfied its obligations under the ADA by providing Ms. Harper with other reasonable accommodations. Charter's Motion for Summary Judgment (Doc. 32) is currently pending before the court.

## Background

The following facts are undisputed except where noted.[1]  Additional undisputed facts are set forth as necessary in the analysis below.

Ms. Harper is a Customer Service Representative for Charter.  She was hired for that role in 2000, at which time she worked for TWC Administration LLC ("TWC").[2]  (Doc. 32-4 ¶ 5.)  In May 2016, TWC's and Charter's parent corporations combined, and Charter became Ms. Harper's employer.  (*Id.* ¶ 8.)  Charter describes the "major duties and responsibilities" of Ms. Harper's job as follows:

> Actively and consistently support all efforts to simplify and enhance the customer experience[.]
>
> Professionally, accurately, and effectively handle in-bound calls from customers requesting[:]
>
> - Video troubleshooting
> - Spectrum Equipment diagnostics
> - Self Service customer education
> - Personal account review
> - Professional appointment coordination
> - Resolve customer questions or concerns in one call

---

[1] Charter argues in its reply (Doc. 46) that the court should deem its statement of undisputed material facts to be admitted by Ms. Harper for the purposes of this motion.  As Charter notes, "while Plaintiff denied or qualified some paragraphs in the [statement of undisputed material facts], *she did not support her position with evidence*" as required by Fed. R. Civ. P. 56(c)(1)(A).  (Doc. 46 at 7.)  Under those circumstances, the court may, but need not, treat the moving party's version of the facts as undisputed for the purposes of the motion.  Fed. R. Civ. P 56(e); L.R. 56(a)(2).  The court declines to treat Charter's statement of material facts as undisputed.  Ms. Harper explained which facts she disputed, and there is evidence to support her positions in the record.  Moreover, the dispute that matters most—Ms. Harper's objections to paragraph 13 of Charter's statement of undisputed material facts—relies primarily on inferences supported by the larger body of evidence rather than any particular piece of evidence.  Ms. Harper also provided a counterstatement of material facts with citations to the record, which largely mirrors her disputes of Charter's statement of undisputed material facts.

[2] Ms. Harper identifies her former employer as "Time Warner Cable," while Charter identifies her former employer as "TWC Administration LLC."

Employee expectations include delivering on monthly performance metrics and performing other duties as may be requested by leadership.

(Doc. 43-12 at 2.)

Ms. Harper has several serious, chronic medical conditions.  (Doc. 43-1 ¶¶ 4–6; Doc. 43-3.)  Those conditions include chronic obstructive pulmonary disease ("COPD"), chronic bronchitis, chronic bronchial asthma, diabetes mellitus type 2, microvascular disease, diabetic polyneuropathy, spondylosis of the lumbar spine, sciatica, sleep apnea, hypertension, and congestive heart failure.  (Doc. 43-1 ¶ 6; Doc. 43-3.)  As a result of these conditions, Ms. Harper has difficulty standing, walking, and bending.  (Doc. 43-1 ¶ 6; Doc. 43-3.)  She cannot drive or be the passenger in a car for more than 20–25 minutes "due to uncontrollable muscle spasm of her back upper and lower extremity."  (Doc. 43-3 at 8.)

Ms. Harper's bronchial asthma, diabetes, and diabetic neuropathy cause symptoms that interfere with her ability to work.  When she has a relapse in her bronchial asthma, she experiences "uncontrollable coughing, wheezing, shortness of breath, and obstruction of bronchial airways, severely decreasing her ability to breath[e]."  (*Id.* at 10.)  These "flare-ups" often result in prolonged illness, including bronchitis, which requires Ms. Harper to take time off from work.  (*Id.*; Doc. 43-1 ¶¶ 9, 42.)  The flare-ups can be triggered by "hot, cold climate weather, environmental change, stress or emotional upset, [or] upper respiratory tract infections."  (Doc. 43-3 at 10.)  Ms. Harper also has "[d]iabetic flare-ups," which cause "dizziness, faintness, fatigue, numbness, tingling pain in her toes, feet, legs, hands, arms, and fingers," as well as "episodes of explosive uncontrollable diarrhea, frequent urination, nausea and vomiting."  (*Id.*)

In approximately October 2013, after having to take several medical leaves of absence, Ms. Harper asked TWC to allow her to work from home.  (Doc. 32-4 ¶ 6.)  At the time, TWC

had an established work-from-home program that employees could participate in regardless of their need for an accommodation. (*Id.* ¶ 7.) The parties dispute whether Ms. Harper framed her work-from-home request as a request for a reasonable accommodation and whether TWC granted it on that basis. (*Id.* ¶¶ 6–7; Doc. 43-1 ¶¶ 20–21.) Ms. Harper performed well in her role as a Customer Service Representative after her transition to working from home. (Doc. 43-1 ¶ 22; Doc. 43-15.)

When TWC's and Charter's parent corporations combined in 2016, Charter ended TWC's work-from-home program. (Doc. 32-4 ¶ 10.) Ms. Harper received an email notifying her of the change on November 8, 2016, which would become effective on January 8, 2017. (Doc. 43-4.) Thus, from the time the parent corporations combined in May 2016 until January 8, 2017, Charter employees could continue working from home.

On November 8, the same day she received the notice, Ms. Harper sent an email to Kelly Schwallie, the Director of Human Resources for Charter, seeking guidance about how the "announcement may [a]ffect my current ADA accommodation." (Doc. 43-5.) Ms. Harper explained in the email that, "[w]ith the assistance of my current ADA WFH [work-from-home] accommodation, I have been able to continue delivering top performance customer support, as a loyal and dedicated employee, while managing chronic and severe health conditions." (*Id.*) In her response, Ms. Schwallie rejected the idea of allowing Ms. Harper to work from home and instead suggested finding other reasonable accommodations:

> Our records indicate that your participation in the work from home program was a result of a workplace accommodation. Because the job requirements have changed based on business need, we are reengaging you in the interactive process to determine what other reasonable accommodations we can make to allow you to get to work and to perform the essential functions of your job at your physical work location.

(Doc. 43-6.)

Ms. Harper continued to seek a work-from-home accommodation, requesting further explanation from Charter about its decision. (Doc. 43-7.) She argued that she should be granted the accommodation because "there is weekly, monthly, yearly documentation available, which proves the quality of my performance while working from home." (*Id.*) She further disputed that the accommodation would cause any undue hardship for Charter, "seeing that the work from home equipment that I've utilized over the last 18 months remains connected and fully functional in my home." (*Id.*) Finally, she emphasized that working from home was "not a personal preference, but rather [was] medically necessary." (*Id.*) Charter denied her renewed request.

In lieu of Ms. Harper's requested accommodation, Charter provided other modifications to her work arrangements which, in Charter's view, amount to reasonable accommodations. Those arrangements included the following:

- Transfer to a Charter office closer to Ms. Harper's home to shorten her commute;
- A flexible break schedule;
- A private room for Ms. Harper to administer medical treatments as needed;
- A heavy-duty chair with a specialized lumbar pillow and sleep cushion;
- A specialized headset;
- A modified work schedule, namely switching from five eight-hour days to four ten-hour days;
- Assignment to a workstation close to the restrooms and away from air vents; and
- Numerous leaves of absence.

(Doc. 32-4 ¶ 15.) During the time when she was working in person, Ms. Harper received either an overall rating of "Achieved Expected Performance" or "Exceeded Expected Performance" on her annual performance reviews. (*Id.* ¶ 17.)

On March 20, 2020, New York Governor Andrew Cuomo signed an executive order mandating that most New York employees work from home due to the COVID-19 pandemic. (*Id.* ¶ 18.) Ms. Harper and other Charter employees therefore transitioned to remote work. (*Id.* ¶¶ 19–20.) When these pandemic-era restrictions were lifted, Charter began transition its workforce back into the office but ultimately launched a Work at Home Program in July 2022. (*Id.* ¶ 22.) Ms. Harper met the program's eligibility criteria and has thus been able to continue working from home to date. (*Id.*)

## Summary Judgment Standard

Summary judgment may be granted only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). On a summary judgment motion, the court considers the facts in the light most favorable to the plaintiff and draws all reasonable inferences in her favor. *King v. Aramark Servs., Inc.*, 96 F.4th 546, 552 (2d Cir. 2024) (citing *Banks v. Gen. Motors, LLC*, 81 F.4th 242, 251–52 (2d Cir. 2023)). If the record reveals no genuine issue of material fact for trial, summary judgment is appropriate. *Banks*, 81 F.4th at 258. "The movant 'bears the initial burden of showing that there is no genuine dispute as to a material fact.'" *McKinney v. City of Middletown*, 49 F.4th 730, 738 (2d Cir. 2022) (quoting *Jaffer v. Hirji*, 887 F.3d 111, 114 (2d Cir. 2018)).

## Analysis

Charter seeks summary judgment on three grounds: (1) Ms. Harper's claim is moot; (2) Charter provided Ms. Harper with a reasonable accommodation; and (3) Ms. Harper's proposed accommodation is not reasonable. The court addresses these arguments in turn.

## I.      Ms. Harper's Claim is Not Moot

Charter argues that Ms. Harper's claim is moot because Charter has already given her the relief she seeks in this case: the ability to work from home. (Doc. 32-1 at 16–18.) Charter further contends that Ms. Harper has not properly sought monetary damages nor provided proof of her damages, so any claim for such damages at this stage cannot save her claim. (*Id.* at 18–19.)

On November 8, 2016, Ms. Harper requested that Charter allow her to work from home as an accommodation for her "chronic and severe health conditions." (Doc. 43-5.) Ms. Harper has been working from home since the beginning of the COVID-19 pandemic, first because of government mandates and later under Charter's new Work at Home Program. (Doc. 32-4 ¶¶ 18–23.) Charter submits that Ms. Harper "will not be called back into the office" so long as she performs her job adequately. (*Id.* ¶ 23.) Thus, in Charter's view, "an intervening circumstance [has] deprive[d] [Ms. Harper] of a personal stake in the outcome of the lawsuit," making the claim moot. *Doe v. McDonald*, 128 F.4th 379, 384 (2d Cir. 2025).

Under the Work at Home Program, Ms. Harper—like other Charter employees in that program—must meet several criteria to be eligible for remote work:

In order to remain on a remote work assignment, employees must meet the following requirements each scorecard month:

- Top 50% (in peer group) based on a rolling 3-month average – a minimum of 2 eligible scorecards is required

- No new corrective action of any level issued

- Schedule must include 1 weekend shift for representatives who begin working remotely after 8/1/2022

- Work 4 or more OT [overtime] hours during the last scorecard month as business needs require

7

- Meet in-center requirements

  o  Work one full shift in center at least once per month

  o  Technical issues beyond 1 hour require the remainder of the shift to
     be worked in-center

(Doc. 43-11 at 3.)

Ms. Harper argues that, because her permission to work remotely is contingent upon meeting those criteria, Charter has not granted her requested accommodation. Or, at the very least, Charter retains the power to terminate her accommodation for impermissible reasons. Thus, according to Ms. Harper, a grant of injunctive relief by the court would meaningfully affect her rights and redress her injury. (Doc. 43 at 15–16.) For its part, Charter argues that Ms. Harper's request to work from home without meeting the eligibility criteria (1) amounts to a new request for a different accommodation, and (2) is per se unreasonable because "[t]he ADA does not require an employer to excuse an employee from performance criteria, as that would compel either the elimination of an essential job function or creation of a new job." (Doc. 46 at 10–11.)

First, the court rejects the notion that Ms. Harper has requested a new accommodation and is thus raising a new argument on summary judgment. Charter characterizes this "new" accommodation request as a request to not only work from home "but also to do so without being held to performance standards." (Doc. 46 at 10.) Construing the evidence in the light most favorable to Ms. Harper, she requested that she be allowed to work remotely while being held to the same standards as in-person employees. She did *not* request an exemption from performance standards; in her communications with Charter, Ms. Harper specifically stated that she understood "that Charter Communications may be within its rights to deny telework as an accommodation, (1) if I could not complete the essential functions of my position in that manner, or (2) if it causes an undue hardship to the business." (Doc. 43-7 at 6.) As far as the court can

8

tell from the evidence on the record, Charter does not impose the Work at Home Program

requirements on its in-person staff.  Indeed, it would be impossible for them to do so, as Charter

requires its Work at Home staff to stay in the top 50% of their peer group, something that by

definition not all employees can achieve.

The court also notes that, when Ms. Harper filed her complaint in June 2021, Charter had

not yet instituted its Work at Home Program.  Thus, she could not have raised the issue about

additional criteria at that time.  She asked for in 2016 what she asks for now: to work from home

while being held to the same standards as in-person employees.

 Charter's argument about a "new" accommodation request also implicitly recognizes

that Ms. Harper's current situation is *not* the same as what she has requested.  She is currently

being held to higher standards and requirements than in-person employees.  Currently, Ms.

Harper must consistently perform better than 50% of her peers, must never be subject to any

corrective action of any severity, must work overtime, and must travel to the office one day per

month if she wishes to retain her work-at-home accommodation.  The relief she requests is

different than the relief she has been provided.  Ms. Harper's claim is not moot.[3]

Even if the court agreed with Charter on the issue of injunctive relief, Ms. Harper's claim

would not be moot for the additional reason that she is seeking monetary damages and has

produced sufficient evidence of those damages to survive summary judgment.  As a preliminary

matter, and contrary to Charter's assertions, Ms. Harper *did* request monetary damages in her

complaint.  (Doc. 1 at 6 ("WHEREFORE, I respectfully request this Court to grant me such

---

[3] Charter's argument that Ms. Harper's accommodation, as framed in this section, is
per se unreasonable goes to the merits of Ms. Harper's claim for a reasonable accommodation,
not to whether her claim is moot.  The court will therefore address that issue in its analysis of the
merits of Ms. Harpers claim.

relief as may be appropriate, including injunctive orders, damages, costs and attorney's fees.").)
Ms. Harper has also produced evidence that she had to hire someone to drive her to work (Doc.
43-1 ¶ 39); that she had to take significant time off of work due to an increase in flare ups,
presumably leading to lost income (*Id.* ¶ 42; Doc. 43-14); that she experienced increased stress
and anxiety due to the accommodation denial (Doc. 43-1 ¶ 39; Doc. 43-3 at 3, 7); and that she
suffered adverse health consequences as a result of the accommodation denial (Doc. 43-3 at 3, 7,
10–11; Doc. 43-1 ¶¶ 39, 42).  While Ms. Harper does not deny Charter's claim that she failed to
provide a calculation of her damages, that failure does not mean she has failed to provide
evidence that she incurred damages as a result of the denied accommodation.  (*See* Doc. 43 at
12.)  The amount of Ms. Harper's damages is a question for the jury and not one the court needs
to resolve on this motion for summary judgment.

## II.    The Merits of Ms. Harper's Claim[4]

The ADA prohibits discrimination on the basis of disability in employment.  42 U.S.C.
§ 12112(a).  Discrimination includes "not making reasonable accommodations to the known
physical or mental limitations of an otherwise qualified individual with a disability who is an
applicant or employee, unless such covered entity can demonstrate that the accommodation
would impose an undue hardship on the operation of the business of such covered entity."  *Id.*
§ 12112(b)(5)(A).  The ADA defines a "qualified individual" as "an individual who, with or

---

[4] As required, Ms. Harper filed a complaint with the Equal Employment and Opportunity
Commission's ("EEOC") before filing this lawsuit.  The EEOC determined that Charter had
failed to provide Ms. Harper with a reasonable accommodation in violation of the ADA.  (Doc. 1
at 8–9.)  In her response, Ms. Harper argues that the EEOC's favorable determination is
admissible evidence and that it precludes summary judgment.  Because the court ultimately
denies the Motion for Summary Judgment without relying on the EEOC's determination, the
court declines to rule on the determination's admissibility at this time and neither cites nor relies
on it in this order.

10

without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." *Id.* § 12111(8). Thus, to establish a prima facie case for failure to accommodation,

> a plaintiff must show by a preponderance of the evidence that: (1) [her] employer is subject to the ADA; (2) [s]he was disabled within the meaning of the ADA; (3) [s]he was otherwise qualified to perform the essential functions of [her] job, *with or without reasonable accommodation*; and (4) [her] employer refused to make a reasonable accommodation."

*Tudor v. Whitehall Cent. Sch. Dist.*, 132 F.4th 242, 246 (2d Cir. 2025) (cleaned up).

In this case, Charter contests only the fourth element of the prima facie case. (*See* Doc. 32-1.)

### A.     Triable Issue Remains on Whether Charter Provided a Reasonable Accommodation

Charter's central argument in its motion for summary judgment is that it provided Ms. Harper with a reasonable accommodation—just not the one she requested. Ms. Harper does not dispute that Charter provided these other accommodations but nevertheless maintains that those accommodations were insufficient.

Charter submits that it accommodated Ms. Harper "no less than *forty-one* times, and that those accommodations were both reasonable and effective." (Doc. 32-1 at 13.) Those accommodations included those listed above, such as transfer to a closer office and a flexible break schedule. (Doc. 32-4 ¶ 15.) Again, Ms. Harper does not dispute any of these claims.

Charter correctly states that an employer need only provide a reasonable accommodation, not a "perfect accommodation" or the accommodation preferred by the employee. *Noll v. Int'l Bus. Machs. Corp.*, 787 F.3d 89, 94 (2d Cir. 2015). If an "employer has already taken (or offered) measures to accommodate the disability, the employer is entitled to summary judgment

11

if, on the undisputed record, the existing accommodation is 'plainly reasonable.'" *Id.* (quoting *Wernick v. Fed. Reserve Bank of N.Y.*, 91 F.3d 379, 385 (2d Cir. 1996)).

Charter misapprehends, however, what constitutes a "reasonable accommodation." According to Charter, "the effectiveness and reasonableness of an accommodation . . . are measured by whether the accommodation allows the plaintiff to perform her essential job functions." (Doc. 46 at 3.) Charter thus concludes that its accommodations must have been reasonable because "the undisputed evidence shows (1) [Ms. Harper] has remained employed for more than seven years since Charter denied her [work-from-home] request, and (2) she has received positive performance reviews each year, either meeting or exceeding expectations." (Doc. 46 at 8–9.)

A reasonable accommodation encompasses more than just its effectiveness in allowing an employee to perform the essential functions of her job. The regulations provide three definitions of a "reasonable accommodation," depending on the applicable circumstance:

> (1) The term reasonable accommodation means:
>
> (i) Modifications or adjustments to a job application process that enable a qualified applicant with a disability to be considered for the position such qualified applicant desires; or
>
> (ii) Modifications or adjustments to the work environment, or to the manner or circumstances under which the position held or desired is customarily performed, that enable an individual with a disability who is qualified to perform the essential functions of that position; or
>
> (iii) Modifications or adjustments that enable a covered entity's employee with a disability to enjoy equal benefits and privileges of employment as are enjoyed by its other similarly situated employees without disabilities.

29 C.F.R. § 1630.2(o)(1)(i)–(iii). For an employee who cannot perform the essential functions of her position without an accommodation, a reasonable accommodation would be one that enabled

her to perform those functions.  A reasonable accommodation will look different, however, for an employee who cannot otherwise enjoy the equal benefits and privileges of employment.

In *Tudor*, the Second Circuit considered a closely related issue: "whether the ability to perform the essential functions of a job without an accommodation is fatal to an employee's ADA or Rehabilitation Act failure-to-accommodate claim."  132 F.4th at 246.  The court began with the language that an individual is "otherwise qualified for a job if she is able to perform the essential functions of that job, either *with or without a reasonable accommodation*."  *Id.* (emphasis original).  The court then reasoned that,

> [u]nder a straightforward reading of the phrase 'with or without,' the fact that an employee *can* perform her job responsibilities without a reasonable accommodation does not mean that she *must*: she may be a 'qualified individual' entitled to reasonable accommodation even if she can perform the essential functions of her job without one.

*Id.*  For instance, the court noted, "[i]n at least some circumstances, the ADA requires an employer to offer accommodations that mitigate (if not necessarily eliminate) an employee's disability-related pain."  *Id.* at *4.

The necessary corollary is that an accommodation is not reasonable as a matter of law just because it allows an employee to perform the essential functions of her job.  Yet Charter has attempted to argue exactly that.

The D.C. Circuit's decision in *Hill v. Associates for Renewal in Education, Inc.*, 897 F.3d 232 (D.C. Cir. 2018), cited by the Second Circuit in *Tudor*, is instructive.  In that case, the plaintiff was a teacher with a leg prothesis who "admitted he was able to perform the essential functions of his job without accommodation, but not without pain."  *Id.* at 236 (internal quotation marks and citation omitted).  As reasonable accommodations, the plaintiff requested a classroom on the second rather than the third floor as well as a teaching aide.  The defendant argued that,

because the plaintiff admitted he could perform his essential job functions if he worked on the

second floor, albeit with pain, the defendant did not have to *also* provide him with a teaching

aide. *Id.* at 239. The D.C. Circuit was unmoved by the argument, holding that "[a] reasonable

jury could conclude that forcing Hill to work with pain when that pain could be alleviated by his

requested accommodation violates that ADA." *Id.* at 239.

Viewing the evidence in the light most favorable to Ms. Harper, this case presents an

analogous situation. Specifically, the evidence tends to support Ms. Harper's claim that

commuting to work and working in an office setting increased the frequency of her bronchial

asthmatic flare-ups. In her affidavit, Ms. Harper states that her "frequent bronchial asthmatic

flare-ups are triggered by exposure to hot and cold climate weather, environmental change, upper

respiratory infections, and, most importantly, stress and becoming emotionally upset."

(Doc. 43-1 ¶ 11.) According to Ms. Harper, commuting to work and working in an office expose

her to all these triggers, including stress. (*Id.* ¶¶ 32, 39.)

A letter from Ms. Harper's medical provider, Marcel Rozario, confirms these triggers:

> Ms. Harper suffers from several medical conditions and disabilities which require
> daily attention and treatment. One of her major medical challenges is bronchial
> asthma. Ms. Harper suffers with this chronic relapsing inflammatory debilitating
> disorder, which results in uncontrollable coughing, wheezing, shortness of breath,
> and obstruction of bronchial airways, severely decreasing her ability to breath[e].
> Her condition changes in severity over short periods of time. Ms. Harper has
> frequent bronchial asthma flare-ups which are triggered by exposure to hot, cold
> climate weather, environmental change, stress or emotional upset, upper respiratory
> tract infections, etc.

(Doc. 43-3 at 10.)

The undisputed evidence is that Ms. Harper's flare-ups require medical treatment, cause

Ms. Harper suffering, and cause Ms. Harper to miss significant amounts of work. Charter

counters, however, that Ms. Harper continued to take significant leaves of absence once she was

allowed to begin working from home.  It therefore posits that Ms. Harper would not have been any better off working from home.

Ms. Harper *did* continue to miss a considerable amount of work after she started working from home in 2020.  But the decrease in the percent of workdays she missed once she started working remotely is noteworthy.  In 2018, Ms. Harper missed 85% of her scheduled work hours. (Doc. 43-14 at 3.)  In 2019, she missed 67%, amounting to 139 days.  (*Id.* at 2.)  In 2020, that percentage dropped to 40%, with 50 of her 81 days of ADA leave occurring before the end of April—that is, concentrated in the period before Charter transitioned its employes to remote work due to the pandemic.  (*Id.* at 4.)  Ms. Harper likewise missed 40% of her scheduled hours in 2021, a total of 87 days.  (*Id.* at 5.)  Although a final percentage was not calculated for 2022 (the evidence was produced in October 2022), Ms. Harper appeared to be on track to once again miss approximately 40% of her scheduled hours, or perhaps less.  (*Id.* at 6.)  On that evidence, a jury could conclude that working in person meaningfully increased the number of flare-ups Ms. Harper experienced.

The evidence also supports Ms. Harper's contention that she can better manage her multiple, serious health conditions from home.  In her declaration, Ms. Harper attests that she has "advanced in-home medical equipment" that helps her manage her conditions (Doc. 43-1 ¶ 15), which her doctor confirms (Doc. 43-3 at 11).  Her medical provider also commented in a letter that it is "very difficult" for Ms. Harper to leave home when she is having a flare-up and that leaving home "causes anxiety for her."  (*Id.* at 3.)  In one letter, her provider wrote, "I have written multiple letters supporting work from home that will reduce stress and may contribute towards ongoing [sic] all these deadly diseases."  (*Id.* at 7.)  Ms. Harper attests that, when she

works from home, she has fewer episodes of "explosive and uncontrollable diarrhea, frequent urination, nausea, and vomiting." (Doc. 43-1 ¶ 14.)

Ms. Harper's "condition changes in severity over short periods of time." (Doc. 43-3 at 10.) While working in person, she has "experienced uncontrollable coughing episodes and flare ups," causing her to return home to complete her shift. (Doc. 43-1 ¶ 32.) According to her medical provider, Ms. Harper also has diabetic flare-ups, which cause dizziness, faintness, fatigue, numbness, tingling pain in her toes, feet, legs, hands, arms, and fingers." (Doc. 43-3 at 10.)

On this evidence, a jury could conclude that Charter failed to provide Ms. Harper with a reasonable accommodation. Taking the evidence in the light most favorable to Ms. Harper, Charter's in-person requirement exacerbated Ms. Harper's serious health conditions, caused her anxiety and pain, required her to receive additional medical treatment, and notably increased the amount of (presumably unpaid) medical leave Ms. Harper needed to take. On that view of the evidence, Ms. Harper did not "enjoy equal benefits and privileges of employment as are enjoyed by . . . other similarly situated employees without disabilities." 29 C.F.R. § 1630.2(o)(1)(iii).

### B.    Triable Issue Remains on Whether Requested Accommodation is Reasonable

In the alternative, Charter argues that Ms. Harper has failed to demonstrate that her requested accommodation was reasonable. (Doc. 46 at 9.) Charter proffers two reasons that Ms. Harper's work-from-home request was unreasonable. First, it would pose "technological difficulties." (Doc. 46 at 10.) Secondly, "Charter was tasked with implementing its policies company-wide with thousands of transferred employees, replacing TWC's operations with its own, and seamlessly effectuating a massive corporate combination, which required in-person attendance." (*Id.*) To the extent that Ms. Harper requests that she be held to the same standards

16

as in-person rather than remote employees, Charter also argues that such a request is per se unreasonable because "[t]he ADA does not require an employer to excuse an employee from performance criteria, as that would compel either the elimination of an essential job function or creation of a new job." (Doc. 46 at 10–11.)

"To establish a 'reasonable accommodation,' a plaintiff 'bears only a burden of production' that 'is not a heavy one.'" *Roberts v. Royal Atl. Corp.*, 542 F.3d 363, 370 (2d Cir. 2008) (quoting *Borkowski v. Valley Cent. Sch. Dist.*, 63 F.3d 131, 138 (2d Cir. 1995)). "It is enough for the plaintiff to suggest the existence of a plausible accommodation, the costs of which, facially, do not clearly exceed its benefits." *Borkowski*, 63 F.3d at 138. If the plaintiff makes that showing, "the risk of nonpersuasion falls on the defendant." *Id.*

Ms. Harper has met that burden. Her primary evidence that her requested accommodation was reasonable is that she successfully worked from home in the same job, with the same job description and tasks, when she worked for TWC and again when Charter implemented its work from home program. (*See* Doc. 43-15; Doc. 43-7 at 6; Doc. 32-2 ¶¶ 32–33.) Ms. Harper points to both her positive job performance and the technological feasibility of the accommodation. Indeed, at the time Ms. Harper requested her accommodation, she sought clarification on how working from home would create an undue hardship for Charter "seeing that the work from home equipment that I've utilized over the last 18 months remains connected and fully functional in my home." (Doc. 43-7 at 6.) That Ms. Harper successfully worked from home both before and after the denied accommodation request and that she already had the equipment necessary to work from home is sufficient to meet her burden of persuasion.

The evidence Charter has adduced to counter Ms. Harper's does not warrant summary judgment. Charter's primary evidence on this issue is the declaration of Amy Lauricella.

(Doc. 32-4.)  Ms. Lauricella attests that "Charter's business values and operations differed from TWC's in many respects, including its stance on [working from home]." (*Id.* ¶ 9.)  According to Ms. Lauricella, "Charter prioritized in-person attendance to foster collaboration, allow for immediate and direct supervision and feedback, permit *ad hoc* team meetings, and promote growth and opportunity by way of in-person observation and assistance." (*Id.*)  She also emphasizes the importance of the transitional phase Charter was in: "Charter had to take on the considerable goal of bringing TWC's employees and operations in line with Charter's business objectives, which could only be accomplished through in-person attendance." (*Id.*)  Finally, she states that because Charter ended TWC's work-from-home program, "Charter no longer had the infrastructure and technical abilities that TWC had to support employees working from home." (*Id.* ¶ 10.)

Though this evidence raises a factual question for the jury, it does not foreclose judgment for Ms. Harper.  On the evidence presented, a jury could certainly find that Charter had the technological ability to support Ms. Harper's work-from-home accommodation, especially because former TWC employees could continue working remotely from May 2016 to January 2017.  And, while the court appreciates the transitional period that Charter was in when it purchased TWC, Charter has adduced no evidence that allowing one employee to work from home would have interfered with its larger project of "bringing TWC's employees and operations in line with Charter's business objectives." (Doc. 32-4 ¶ 9.)  As noted above, the reasonableness of an accommodation also depends on both its costs and its benefits, and Ms. Harper has presented credible and seemingly undisputed evidence that working from home would have substantially improved her health.

The court also considers whether the work-from-home accommodation would have

amounted to an elimination of one of the essential functions of Ms. Harper's job, rendering it

per se unreasonable.

> Evidence of whether a particular function is essential [under the ADA] includes,
> but is not limited to: (i) The employer's judgment as to which functions are
> essential; (ii) Written job descriptions prepared before advertising or interviewing
> applicants for the job; (iii) The amount of time spent on the job performing the
> function; (iv) The consequences of not requiring the incumbent to perform the
> function; (v) The terms of a collective bargaining agreement; (vi) The work
> experience of past incumbents in the job; and/or (vii) The current work experience
> of incumbents in similar jobs.

29 C.F.R. § 1630.2(n)(3).  "[A] court must give substantial deference to an employer's judgment

as to whether a function is essential to the proper performance of a job." *McBride v. BIC*

*Consumer Prods. Mfg. Co.*, 583 F.3d 92, 98 (2d Cir. 2009).  "The term 'essential functions,'

which is not defined in the statutes themselves, is generally defined in ADA regulations

promulgated by the Equal Employment Opportunity Commission ('EEOC') to mean the

'fundamental' duties to be performed in the position in question, but not functions that are

merely 'marginal.'" *Tafolla v. Heilig*, 80 F.4th 111, 119 (2d Cir. 2023) (internal quotation marks

and citation omitted).  In making this assessment, the court considers the totality of the

circumstances. *Id.*

Here, a jury could find that working in person was not an essential function of Ms.

Harper's job and, further, that she could perform all the essential functions of her job from home.

The evidence on this issue is largely the same as the evidence that Ms. Harper's requested

accommodation was reasonable: she performed her job from home for two years before being

denied the accommodation and is now again permitted to work from home.  And she currently

performs her job better than at least 50% of her peers.  (Doc. 32-2 ¶¶ 32–33; Doc. 43-11 at 3.)

Additionally, nothing in Ms. Harper's job description suggests that being in person is an essential function of her job. (*See* Doc. 43-12 at 2.)

Charter also argues that it would be facially unreasonable to allow Ms. Harper to work from home even if she fails to meet the eligibility requirements for the Work at Home Program. (Doc. 46 at 6.) Charter cites case law holding that a request "that [an] employer accept and excuse . . . misconduct and poor work performance . . . is unreasonable as a matter of law." *Canales-Jacobs v. N.Y.S. Off. of Ct. Admin.*, 640 F. Supp. 2d 482, 500 (S.D.N.Y. 2009); *see also McElwee v. County of Orange*, 700 F.3d 635, 641 (2d Cir. 2012) (holding that "a requested accommodation that simply excuses past misconduct is unreasonable as a matter of law").

This case is distinguishable. As discussed above, Charter places additional requirements on its remote staff that it does not place on in-person employees. Ms. Harper could fail to meet the stringent requirements for the Work at Home Program while simultaneously performing her job at a high level. The additional requirements are not "essential functions" of her job, as employees who hold the same job—but who work in person—do not need to carry out those functions or meet those standards. A jury may conclude based on evidence at trial that Charter has legitimate reasons to place these extra requirements on remote staff that would make it unreasonable for it to waive those requirements in Ms. Harper's case. But allowing Ms. Harper to work from home so long as she is meeting the standards required for in-person employees is not facially unreasonable. Even if it were per se unreasonable to exempt Ms. Harper from these requirements, summary judgment would be inappropriate given that Charter denied Ms. Harper the right to work from home at all for over two years.

## Conclusion

For the foregoing reasons, Charter's Motion for Summary Judgment (Doc. 32) is

DENIED.

Dated this 21 day of May, 2025.

Geoffrey W. Crawford, Judge
United States District Court

21